UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

HARRY REYES,

                            Plaintiff,

           -v-

THE CITY OF NEW YORK, New York City Police
Department Detective ROBERTO CORDERO (Shield
No. 04115), Detective JOHN TALAVERA (Shield No.
7085), Detectives JOHN DOE 1 through JOHN DOE 3
(the name "John Doe" being fictitious as the identities
are presently unknown), in their individual capacities,

                            Defendants.

------------------------------------------------------------------------x

**COMPLAINT AND DEMAND
FOR A JURY TRIAL**


**12-CV-8459 (RJS) (AJP)**

> "Here, all the officer saw was the defendant, after a course of
> innocuous conduct on the street, enter a grocery store where he
> very briefly touched hands with another man while holding a paper
> bag. Viewed as a whole, this is simply not enough to establish
> probable cause."
> -- Hon. Robert M. Stolz, Justice of Supreme Court, New York
> County, Order dated March 14, 2012 in People v. Harry Reyes,
> Ind. 2945/11 (N.Y. Co., Sup. Ct.)

Plaintiff HARRY REYES, by his attorney David B. Rankin of Rankin & Taylor, PLLC,

as and for his complaint, does hereby state and allege:

## PRELIMINARY STATEMENT

1. This is a civil rights action brought to vindicate plaintiff's rights under the Fourth, Fifth and

    Fourteenth Amendments of the Constitution of the United States, through the Civil Rights

    Act of 1871, as amended, codified as 42 U.S.C. § 1983, and along with a pendant claim for

    malicious prosecution under the laws of the State of New York.

2. Plaintiff HARRY REYES' rights were violated he was arrested and subsequently prosecuted without cause. In short, along with other New York City Police Department ("NYPD") narcotics detectives, Detective ROBERTO CORDERO caused Mr. REYES to be arrested and prosecuted after claiming he observed – from across a total of six traffic lanes and two parking lanes of a busy avenue – Mr. REYES "sort of touch hands" with a man who was subsequently arrested for possessing narcotics.

3. As the suppression court noted, such conduct does not amount to probable cause to arrest, much less prosecute.

4. Nevertheless, acting on that phony observation, Det. CORDERO and other narcotics detectives arrested and searched Mr. REYES, where they found Mr. REYES' prescription pill bottle for Endocet and several tablets of the drug.

5. As evidenced by his pill bottle, Mr. REYES lawfully possessed the Endocet found upon him.

6. Moreover, Jose Torres – the person who is alleged to have bought drugs from Mr. REYES – did not have Endocet in his possession at the time of arrest; rather, Torres was found with Suboxone – a drug with a distinct appearance and chemical composition as Endocet, the prescription drug found on Mr. REYES.

7. Not only did the detectives lack probable cause to arrest ab initio, but – even after finding Mr. REYES with Endocet and prescription pill bottle and Jose Torres with Suboxone – the detectives continued to lack probable cause to believe that (1) Mr. REYES had sold anything to Torres and/or (2) Mr. REYES possessed his Endocets unlawfully.

8. Thus, there was no objectively reasonable basis to arrest Mr. REYES, detain him for approximately 50 hours, and prosecute him for nearly 11 months.

9.  By reason of defendants' actions, including their unlawful arrest and malicious prosecution, Mr. REYES was deprived of his constitutional rights.

10. Mr. REYES also seeks an award of compensatory and punitive damages and attorneys' fees.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343 (3-4). This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States.

12. Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) in that Mr. REYES' claim arose in the Southern District of New York.

13. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

14. Consistent with the requirements of New York General Municipal Law § 50-e, Mr. REYES filed a timely Notice of Claim with the New York City Comptroller on or about July 11, 2012, within 90 days of the accrual of his claim for malicious prosecution under New York law. Thus, this Court has supplemental jurisdiction over Mr. REYES' claims for malicious prosecution under New York law because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

15. Mr. REYES' claims have not been adjusted by the New York City Comptroller's Office.

## PARTIES

16. Plaintiff HARRY REYES is, and was at all times relevant to this action, a resident of the County and State of New York.

17. Defendant THE CITY OF NEW YORK ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is

ultimately responsible. The CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the NYPD.

18. Defendants NYPD Det. ROBERTO CORDERO, Det. JOHN TALAVERA, and NYPD Dets. JOHN DOE 1 through 3 were at all times relevant herein, officers, employees and agents of the NYPD. Upon information and belief, all of these detectives were assigned to the NYPD's Narcotics Boro Manhattan North on the date of the incident described herein. The detectives are being sued herein in their individual capacities.

19. The true names and shield numbers of Dets. DOE 1 through 3 are not currently known to Mr. REYES. However, they were employees or agents of the NYPD on May 27, 2011. Accordingly, they are entitled to representation in this action by the New York City Law Department ("Law Department") upon their request, pursuant to New York State General Municipal Law §50-k.

20. The Law Department, then, is hereby put on notice (a) that Mr. REYES intends to name those officers as defendants in an amended pleading once their true names and shield numbers become known to him and (b) that the Law Department should immediately begin preparing their defenses in this action.

21. At all times relevant herein, defendants Dets. CORDERO, TALAVERA, and DOE 1 through 3 were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of the NYPD, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and

incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

22. The defendants' acts hereafter complained of were carried out intentionally, recklessly, with malice, and in gross disregard of Mr. REYES' rights.

## STATEMENT OF FACTS

23. The events herein complained of occurred primarily in the early afternoon of Friday, May 27, 2011 in the vicinity of Third Avenue and East 116th Street in Manhattan, and thereafter.

24. In the early afternoon of that day, Mr. REYES walked out of a corner store. He then briefly walked and talked with two acquaintances from the neighborhood.

25. After a short time walking and talking, Mr. REYES parted ways with the men and walked into a nearby shop to look for new eyeglass frames.

26. Mr. REYES briefly looked around inside the shop, then he left.

27. After walking approximately a block from the shop, Det. CORDERO and other of the defendants – dressed in plainclothes –  approached Mr. REYES from behind and placed him under arrest.

28. Mr. REYES soon thereafter noticed other DOE defendants had also arrested one of his acquaintances, Jose Torres.

29. The detectives then searched both Mr. REYES' person and his black Nike backpack. In the course of their searches, the detectives found and seized, inter alia, a couple dozen tablets of the painkiller Endocet and the corresponding prescription pill bottle for that medicine.

    a.   Endocet is a generic brand for the painkiller Percocet.

    b.   The active ingredient in Endocet is oxycodone.

30. At all times relevant herein, and consistent with the pill bottle in his possession, Mr. REYES had a valid, current prescription from his doctor for Endocet.

31. Upon information and belief, the detectives searched Jose Torres' person and belongings and seized a quantity of Suboxone therein.

    a.  Upon information and belief, Suboxone is an alternative to the drug methadone, which is typically used to treat chronic pain and/or to opiate addiction.

    b.  Upon information and belief, Suboxone contains buprenorphine and nalaxone; it does **not** contain oxycodone.

32. Endocet and Suboxone are not the same drug; they even have entirely distinct appearances.

33. Nevertheless detectives then took Mr. REYES to a nearby police precinct. Later that night or early the next morning, Mr. REYES was transferred to Central Booking where he spent the next two nights.

34. Upon information and belief, Det. CORDERO forwarded his phony observations to a narcotics prosecutor.

35. On Sunday, May 29, 2011 at approximately 3:30 p.m., Mr. REYES was brought before the criminal court and was charged with both selling and possessing illegal narcotics in alleged violation of N.Y. Penal Law §§ 220.16(1) and 220.39(1). The charges were contained on docket number 2011NY039035.

36. The felony complaint against Mr. REYES was sworn to by NYPD Det. Christopher McNicolas and was based largely on utter fabrications apparently supplied by Det. CORDERO.

37. Specifically, upon information and belief, Det. CORDERO knowingly lied when he stated he observed Mr. REYES sell oxycodone to Jose Torres.

6

38. As stated above, and as would be obvious to any observer, Suboxone (the drug found on Jose Torres) *is entirely different* than the prescription Endocet found in Mr. REYES' possession.

39. The criminal court set bail at $2,500.

40. Soon thereafter, Mr. REYES' son supplied the bail money and his father was released in the late afternoon or evening of May 29, 2011.

41. Upon information and belief, Det. CORDERO testified before a grand jury that he observed Mr. REYES sell narcotics to Jose Torres.

42. Upon information and belief, Det. CORDERO did not inform the grand jury of the exculpatory information he had in his possession, e.g., that he, in fact, *did not* witness Mr. REYES commit any criminal act.

43. Upon information and belief, Det. CORDERO did not tell the grand jury that Mr. REYES had a valid, current prescription for Endocet.

44. Upon information and belief, Det. CORDERO did not tell the grand jury that Mr. REYES and Jose Torres were found with *completely distinct controlled substances*, rather than the same substance.

45. Upon information and belief, Det. CORDERO knew he did not observe Mr. REYES sell anything – much less Suboxone or any other controlled substance – to Jose Torres or anybody else. Upon information and belief, he also knew about Mr. REYES' prescription pill bottle which plainly stated that Mr. REYES' had a valid, current prescription for Endocet. Nevertheless, upon information and belief, Det. CORDERO's lies to the prosecutor and in the criminal court complaint supplied the basis for the initiation of criminal charges against Mr. REYES. Upon information and belief, Det. CORDERO repeated these lies to the grand jury, directly causing it to indict Mr. REYES with those charges. And, despite having the

exculpatory information in his possession about his lies which caused and perpetuated Mr. REYES' prosecution, Det. CORDERO never caused this information to be forwarded to Mr. REYES or his criminal defense attorney.

46. According to Det. CORDERO's testimony at the Mapp/Dunaway hearing, Det. TALAVERA was sitting next to Det. CORDERO at the time of CORDERO's alleged observations. Upon information and belief, he knew Det. CORDERO did not actually observe Mr. REYES engage in criminal conduct, yet he chose not to intervene to prevent Det. CORDERO from initiating and perpetuating Mr. REYES' arrest and prosecution.

47. The grand jury subsequently indicted Mr. REYES with criminal possession of a controlled substance in the third and fourth degrees, N.Y. Penal Law §§ 220.16(1) and 220.09(1). The charges were contained on Indictment No. 2945/2011.

48. The grand jury did not indict Mr. REYES for selling narcotics.

49. The prosecution of Mr. REYES for the remaining possession-related charges lasted nearly 11 months.

50. On February 21, 2012, New York County Supreme Court Justice Robert M. Stolz presided over a Mapp/Dunaway suppression hearing.

51. There, Det. CORDERO testified that he observed Mr. REYES and Jose Torres enter a store on Third Avenue.

52. Det. CORDERO further testified that from his position *across* Third Avenue (which has three traffic lanes and a parking line running in both directions), he observed Mr. REYES take out a brown bag and – for a second or two – "sort of touch hands" with Torres.

53. Det. CORDERO admitted he did not see an exchange of money or drugs.

54. After receiving this testimony and hearing arguments from counsel, Justice Stolz ruled that Det. CORDERO lacked probable cause to arrest Mr. TORRES and subsequently seize his Endocets.

55. As Justice Stolz concluded, "Even crediting the detective's somewhat improbable testimony that, from the other side of a busy avenue, he observed the defendant at the cash register of a store, and further observed the defendant in possession of a brown grocery-type bag, touch hands with Torres, within the recess of the store in daylight, the totality of the circumstances was insufficient to establish probable cause to believe that a narcotics sale had occurred… Here, all the officer saw was the defendant, after a course of innocuous conduct on the street, enter a grocery store where he very briefly touched hands with another man while holding a paper bag. Viewed as a whole, this is simply not enough to establish probable cause."

56. Because the pills seized from Mr. REYES were suppressed, the government moved to dismiss the entire case against him.

57. The criminal court granted the government's motion to dismiss the charges on or about April 24, 2012.

58. At all times relevant Mr. REYES legally possessed the Endocets seized from him at the time of arrest by way of a prescription from his doctor.

59. Even had the evidence not been suppressed (resulting in immediate suppression and dismissal), Mr. REYES would have been exonerated because he had a valid, current prescription for the pills he had in his possession – a fact known to all of Mr. REYES' arresting officers at the time of his arrest and thereafter.

## FIRST CLAIM
## DEPRIVATION OF RIGHTS
## UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983

60. Mr. REYES incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

61. Defendants, under color of state law, subjected Mr. REYES to the foregoing acts and omissions, thereby depriving Mr. REYES of his rights, privileges and immunities secured by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, including, without limitation, deprivation of the following constitutional rights: (a) freedom from unreasonable seizure of his person, against Dets. CORDERO and TALAVERA; (b) freedom from arrest without probable cause, against Dets. CORDERO and TALAVERA; (c) freedom from false imprisonment, against Dets. CORDERO and TALAVERA; (d) freedom from malicious prosecution by the police, against Det. CORDERO; (e) freedom from having police officers fabricate evidence against him, against Det. CORDERO; (f) freedom from having police officers refuse to disclose exculpatory information in the course of the criminal prosecution here at issue, against Dets. CORDERO, TALAVERA and DOES 1 through 3; and (g) freedom from deprivation of liberty without due process of law, against Dets. CORDERO, TALAVERA and DOES 1 through 3.

62. Defendants' deprivation of Mr. REYES' constitutional rights resulted in the injuries and damages set forth above.

## SECOND CLAIM
## FAILURE TO INTERVENE – FOURTH AMENDMENT – 42 U.S.C. § 1983

63. Mr. REYES incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

64. Members of the NYPD have an affirmative duty to assess the constitutionality of interactions between their fellow members of service and civilians and to intervene where they observe another member of the Police Department or other law enforcement agency violating a person's constitutional rights.

65. Dets. TALAVERA and DOE 1 through 3 were present for the above-described incident and witnessed Det. CORDERO seize, search and arrest Mr. REYES.

66. The arrest of Mr. REYES and the initiation of criminal charges against him was clearly without probable cause or other legal justification, and was based on facts alleged by Det. CORDERO which Dets. TALAVERA and Dets. DOE 1 through 3 knew to be false, yet Dets. TALAVERA and Dets. DOE 1 through 3 failed to take any action or make any effort to intervene, halt or protect plaintiff from being unlawfully and wrongfully arrested and prosecuted.

67. Dets. TALAVERA and Dets. DOE 1 through 3's violations of Mr. REYES' constitutional rights by failing to intervene in plaintiff's unconstitutional arrest and prosecution resulted in the injuries and damages set forth above.

### THIRD CLAIM
### *MONELL* CLAIM AGAINST DEFENDANT CITY – 42 U.S.C. § 1983

68. Mr. REYES incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

69. All of the acts and omissions by Dets. CORDERO, TALAVERA, and DOE 1 through 3 were carried out pursuant to overlapping policies and practices of the CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the CITY and its agency, the NYPD.

70. The acts complained of were carried out by the aforementioned defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

71. The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

   a. Arresting persons known to be innocent in order to meet "productivity goals" (i.e., arrest quotas);

   b. Falsely swearing out criminal complaints, and/or lying and committing perjury during sworn testimony

      i. in order to protect other officers; and/or

      ii. in order to meet said productivity goals;

   c. Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct;

   d. Discouraging police officers from reporting the corrupt or unlawful acts of other police officers;

   e. Retaliating against officers who report police misconduct; and

   f. Failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented by a supervisor or other agent or employee of the NYPD.

72. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY and analogous prosecutions of police officers:

   a. People v. Arbeedy, 06314-2008 (Sup. Ct., Kings Co.) (NYPD narcotics detective found guilty of planting drugs on two innocent civilians; former undercover NYPD narcotics officer, Steve Anderson, testified that fellow narcotics officers routinely maintained a stash of narcotics to plant on innocent civilians in order to help those officers meet their arrest quotas; Mr. Anderson testified concerning the NYPD's practice of "attaching bodies" to the narcotics to make baseless arrests, stating: "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach the bodies to it, they're going to be out of jail

tomorrow anyway, nothing is going to happen to them anyway. That kind of came on to me and I accepted it — being around that so long, and being an undercover"; the presiding judge, Justice Reichbach, stated: "Having been a judge for 20 years, I thought I was not naïve regarding the realities of narcotics enforcement. But even the court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed");

b.  Schoolcraft v. City of New York, 10-CV-6005 (RWS) (S.D.N.Y.) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing said policies and practices to the press);

c.  Long v. City of New York, 09-CV-6099 (AKH) (S.D.N.Y.); People v. Pogan, 06416-2008 (Sup. Ct., N.Y. Co.) (officer who purposefully swore out a false complaint and is convicted of falsifying police records);

d.  Taylor-Mickens v. City of New York, 09-CV-7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct);

e.  Lin v. City of New York, 09-CV-1936 (PGG) (S.D.N.Y.) (officers arrest person lawfully photographing an arrest of a bicyclist in Times Square and swear out a criminal complaint whose facts are contradicted by video evidence);[1]

f.  Colon v. City of New York, 09-CV-0008 (E.D.N.Y.)   In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on Iqbal/Twombly grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officer of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

---

[1]     For a description of this case and settlement, see, Anahad O'Connor, *City Pays $98,000 to Critical Mass Cyclists*, N.Y. Times, March 30, 2010, *available at* http://cityroom.blogs.nytimes.com/2010/03/30/city-pays-98000-to-critical-mass-cyclists/.

g.  <u>Bryant v. City of New York</u>, 22011/2007 (Sup. Ct., Kings Co.) (jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrests officers were expected to make that violated plaintiff's constitutional rights and contributed to her arrest);[2]

h.  <u>Williams v. City of New York</u>, 06-CV-6601 (NGG), 2009 U.S. Dist. LEXIS 94418 (E.D.N.Y.) (officers arrest plaintiff during a "vertical patrol" of a public housing project despite evidence that he had a legitimate reason to be on the premises);

i.  <u>MacNamara v. City of New York</u>, 04-CV-9216 (RJS) (JCF) (S.D.N.Y.) (evidence of perjured sworn statements systematically provided by officers to attempt to cover-up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

j.  <u>McMillan v. City of New York</u>, 04-CV-3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

k.  <u>Avent v. City of New York</u>, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

l.  <u>Smith v. City of New York</u>, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

m.  <u>Powers v. City of New York</u>, 04-CV-2246 (NGG), 2007 U.S. Dist. LEXIS 27704 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

n.  <u>Nonnemann v. City of New York</u>, 02-CV-10131 (JSR) (AJP), 2004 U.S. Dist. LEXIS 8966 (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youth);

o.  <u>Richardson v. City of New York</u>, 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

p.  <u>Barry v. New York City Police Department</u>, 01-CV-10627 *2 (CBM), 2004 U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

---

[2]    For a description of this case and ultimate settlement, see, Oren Yaniv, *Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News, Feb. 19, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/02/19/2011-02-19_court_rules_that_cops_do_use_ quotas_woman_injured_in_2006_arrest_settles_for_750.html.

      q.    <u>Taylor v. City of New York</u>, 01-CV-5750 (ILG) (MDG) (E.D.N.Y.) (same as <u>Richardson</u>; judge at the criminal trial acquitting Mr. Taylor noted, on the record, that he had "significant doubt" about the truthfulness of the officers who testified);

      r.    <u>White-Ruiz v. City of New York</u>, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y. 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption");

      s.    <u>Ariza v. City of New York</u>, 93-CV-5287 (CPS), 1996 U.S. Dist. LEXIS 20250 at*14 (E.D.N.Y.) (police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of a policy to retaliate against police officers who expose police misconduct and a failure to train in the police department);

73. Furthermore, the existence of the aforesaid unconstitutional customs and policies, **specifically with regard to "productivity goals,"** may be further inferred from the following:

      a.    Deputy Commissioner Paul J. Browne has repeatedly admitted that NYPD commanders are permitted to set "productivity goals."[3]

      b.    An NYPD transit lieutenant was captured on tape telling officers to make more arrests to meet a captain's order and do more work if they want overtime assignments. "All they care about is ... summonses and arrests and 250s," Lt. Janice Williams said, using police jargon for the NYPD Stop, Question and Frisk reports. She added, "The bottom line is everybody's individual activity is being looked at." Later in the recording - made during a roll call in 2010 at Transit District 34 in Coney Island - she said only officers with "good productivity" will get the opportunity to work overtime. She also said Capt. James Sheerin wanted every officer to make at least one arrest per month - up from the previous order of one every three months - because crime had spiked and arrest totals were lower than other transit districts. "He wants everyone to get in the mindset that there's no more collar a quarter," Williams said.[4]

      c.    NYPD Officer Adil Polanco has asserted that his command, the 41st Precinct, regularly requires officer to make at least "one arrest and twenty summonses" per

---

[3]    Jim Hoffer, *NYPD Officer claims pressure to make arrests*, WABC-TV Eyewitness News, March 2, 2010, *available at* http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356 ("Police Officers like others who receive compensation are provided productivity goals and they are expected to work").

[4]    Rocco Parascandola, *NYPD Lt. Janice Williams captured on tape pushing for more busts, but brass says there's no quotas*, N.Y. Daily News, March 3, 2011, *available at* http://www.nydailynews.com/ny_local/ 2011/03/03/2011-03-03_nypd_lt_janice_williams_captured_on_tape_pushing_for_more_busts.html.

month. P.O. Polanco's allegations were confirmed by an audiotape obtained by the media. The contents of the tape reveal that these quotas are enforced through coercion and threats of job loss, to wit, a patrol supervisor at the 41st Precinct is overheard saying: "If you think one and 20 is breaking your balls, guess what you'll be doing. You're gong (sic) to be doing a lot more, a lot more than what they're saying." The tape also reveals that another patrol supervisor chimed in and told the officers: "Next week, 25 and one, 35 and one, and until you decide to quit this job and go to work at a Pizza Hut, this is what you're going to be doing till (sic) then."[5]

d.  The New York Daily News obtained and published two (2) internal memos which were posted inside the roll-call room at the NYPD's 77th Precinct. The memos specifically instructed officers about "number of tickets to give drivers for cell phone, seat belt, double-parking, bus stop, tinted windows and truck route violations" they were expected to issue. The memos remained posted for several weeks inside the roll-call room until the media began inquiring.[6]

e.  Responding to a query from a civilian who was cited on consecutive days in November of 2009 for allegedly occupying more than one seat on the New York City subway, the officer responded: "Recently we've been told to write tickets instead of give warnings for this type of thing." The officer explained that they needed to meet quotas.[7]

f.  In December of 2010 and in response to the pressure from their supervisors to write baseless summonses pursuant to the policy and practice of "quotas," police officers at the 79th Precinct considered organizing a so-called "daylong summons boycott." As one officer at the precinct explained, "Nobody feels this is right, asking us to write summonses just to meet a quota."[8]

g.  In response to the planned summons-boycott at the 79th Precinct, on December 13, 2010, Deputy Chief Michael Marino marched into the precinct at roll call with a deputy inspector and read officers the riot act. "Just try it," a police source quoted Marino as saying.  "I'll come down here and make sure you write them." Marino also

---

[5]      *Id.*

[6]      James Fanelli, Cops at Brooklyn's crime-ridden 77th Precinct told to meet quotas for moving violations, memos say, N.Y. Daily News, Nov. 8, 2010, *available at* http://www.nydailynews.com/ny_local/2010/11/08/ 2010-11-08_cops_told_to_meet_quotas.html.

[7]      Tom Namako and Kirsten Fleming, *Nighttime Riders in Big Sit Fit*, The New York Post, December 26, 2009, *available at* http://www.nypost.com/p/news/local/space_hogs_lapped_on_empty_subways_ m7iRAd9b4E9alYPuGvy5OO.

[8]      Rocco Parascandola, *Irate cops at 79th Precinct in Bedford-Stuyvesant threaten boycott over quotas*, N.Y. Daily News, Dec. 12, 2010, *available at* http://www.nydailynews.com/news/ny_crime/2010/12/12/2010-12-12_bklyn_cops_threaten_tixwriting_boycott.html#ixzz180Q0JW7t.

vowed to transfer people, like he did when he was the commanding officer of the 75th Precinct in East New York.[9]

h.  Capt. Alex Perez, the second in command at the NYPD's 81st Precinct, testified in a civil matter before a Brooklyn Supreme Court jury that officers are likely to get poor performance ratings if they have few arrests, conceding that that arrest numbers are a factor in evaluating an officer's performance.[10] Ultimately, the jury in that case ruled that the police had a policy "regarding the number of arrests officers were to make that violated plaintiff's constitutional rights and contributed to her arrest."[11]

i.  The New York City Office of Collective Bargaining concluded that officers in Brooklyn's 75th Precinct were required to issue four parking tickets, three moving violation citations, three "quality-of-life" summonses, make one arrest and two stop-and-frisks each month. Arbitrator Bonnie Siber Weinstock ruled that the NYPD maintained an illegal "summons quota for traffic violations in the precinct and by penalizing officers for failing to meet the stated number of traffic citations." She ordered the city to cease and desist from the practice.[12]

j.  Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the northern Bronx, was investigated for ordering officers to make a certain number of arrests each month. According to The New York Daily News:

> The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.
>
> "You can't make the nine collars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News.

---

[9]  Rocco Parascandola, *Deputy Chief Michael Marino threatens cops at the 79th Precinct who want to go on summons strike*, N.Y. Daily News, Dec. 15, 2010, *available at* http://www.nydailynews.com/ny_local/2010/ 12/15/2010-12-15_summons_strike_i_dare_ya__deputy.html.

[10]  William J. Gorta, *Brooklyn Mom's Suit Targets NYPD Arrest Quotas*, N.Y. Post, Feb. 15, 2011, at 6, available on Westlaw at 2011 WLNR 2986205; see also Oren Yaniv, *Capt. Links Arrests, Evaluation of Cops*, N.Y. Daily News, Feb. 15, 2011, at 20, also available on Westlaw at 2011 WLNR 2986205.

[11]  Oren Yaniv, *Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News, Feb. 19, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/02/19/2011-02-19_court_rules_that_cops_do_use_quotas_woman_injured_in_2006_arrest_settles_for_750.html.

[12]  *New York City Ticket Quota Confirmed, Denied*, The Newspaper.Com, January 21, 2006, *available at* http://www.thenewspaper.com/news/09/914.asp; *see also*, Kirsten Cole, *NYPD's Bogus Little Secret: Parking Ticket Quotas -- Agents Often Caught Citing You For Violations You Didn't Commit*; WCBSTV.com, August 14, 2007, *available at* http://wcbstv.com/topstories/parking.ticket.blitz.2.246533.html (referring to the arbitrator's report).

Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.

Creighton then told the cops to "finagle" the times of arrests so any overtime was paid for by a federally funded anti-drug program, the complaint alleges.

Unbeknownst to Creighton, one officer had his NYPD radio switched on - so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by a 911 dispatcher.[13]

74. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct**, are further evidenced, <u>inter alia</u>, by the following:

    a.  The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resources anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[14]

---

[13]    Allison Gendar, *NYPD captain allegedly caught in arrest quota fixing*, The New York Daily News, November 14, 2007, *available at* http://www.nydailynews.com/news/ny_crime/2007/11/14/2007-11-14_nypd_captain_allegedly_caught_in_arrest_-1.html#ixzz0bfPBhRTz.

[14]    Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

b. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

c. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in Colon v. City of New York, 09-CV-00008 (E.D.N.Y.), in which he noted a "widespread… custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, NYPD Commissioner Raymond Kelly acknowledged, "When it happens, it's not for personal gain.  It's more for convenience."[15]

d. Regarding defendant CITY's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a CITY agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[16] When it does, however, Commissioner Kelly controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during Kelly's tenure, only one-quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[17] As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[18]

75. The existence of the aforesaid unconstitutional customs and practices, **specifically with**

**regard to the practice or custom of officers lying under oath, falsely swearing out**

---

[15]     Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

[16]     In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%). In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%). *See*, CCRB Jan.-Dec. 2007 Status Report at p. 19, *available at* http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf. Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted de facto policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

[17]     Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19.

[18]     Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

**criminal complaints, or otherwise falsifying or fabricating evidence**, are further evidenced, inter alia, by the following:

a.  The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system.  It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[19]

> […]

> What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world.  Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[20]

b.  In June of 2011, in the case in New York County Supreme Court entitled People v. William Eiseman (Ind. No. 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit[ing] to faking a marijuana case against one man and cocaine-related charges against another – and training young [officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eiseman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here."[21]

---

[19]    Mollen Commission Report, p. 36.

[20]    Mollen Commission Report, pp. 40-41.

[21]    Melissa Grace, *NYPD Sgt. William Eiseman pleads guilty to lying under oath in plea deal*, N.Y. Daily News, June 27, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/06/27/2011-06-27_nypd_sgt_william_eiseman_pleads_guilty_to_lying_under_oath_in_plea_deal.html.

c.  In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was released.[22] Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.

> That's a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

> What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

> But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

> Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.[23]

d.  In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of those offenses. The 109th Precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's Office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids." The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest. According to Assistant United States Attorney Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[24]

---

[22]    Murray Weiss, *NYPD in a Liar Storm*, N.Y. Post, Oct. 26, 2009, *available at* http://www.nypost.com/p/news/local/nypd_in_liar_storm_qazMBEm3UNJVogv4NdeqcI.

[23]    *Id.*

[24]    John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at* http://www.nydailynews.com/news/ny_crime/2008/06/20/2008-06-20_claims_of_corruption_at_queens_precinct_.html.

e.  In December of 2009, two (2) officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from the Internal Affairs Bureau. As explained in an article in the New York Post:

> The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.
>
> Some time later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.
>
> [Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30, cuffed him, but then claimed that they had seen him selling the bogus butts to two people, according to sources.
>
> Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.
>
> To complete the ruse, the undercover cop was processed at the station house so as to not tip off Stukes and Tirado about the sting…
>
> [P]olice sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.
>
> "There's pressure on the cops from the bosses and they're getting pressured from headquarters," a police source told The Post.[25]

The officers were indicted for felony perjury, filing a false report and filing a false instrument.[26]

f.  In early 2010, the CITY settled a civil rights lawsuit wherein one Officer Sean Spencer[27] falsely arrested and accused a 41-year old grandmother of prostitution,

---

[25]    Larry Celona and Tim Perone, *Cops Sting Cops*, N.Y. Post, July 30, 2010, *available at* http://www.nypost.com/p/news/local/brooklyn/cops_sting_cops_lyItuTeLedhKWtruJZYsdL.

[26]    John Marzulli, *Brooklyn cops charged with barding into sting operation, arresting a fellow officer on bogus charges*, N.Y. Daily News, July 30, 2010, available at http://www.nydailynews.com/ny_local/2010/07/30/2010-07-30_brooklyn_cops_charged_with_barging_into_sting_operation_arresting_a_fellow_offic.html.

[27]    In sum, the CITY has paid out $80,000 to settle four (4) federal lawsuits against Officer Sean Spencer. John Marzulli, *City shells out $35G to grandmother, Monica Gonzalez, busted as hooker*, New York Daily News, January 7, 2010, available at http://www.nydailynews.com/ny_local/2010/01/08/2010-01-08_city_shells_out_35g_to_granny_busted_as_hooker.html.

promising to pay the woman $35,000. In court documents, Caroline Chen, the attorney representing the CITY in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense."[28]

g. Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct - are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[29]

76. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct**, are further evidenced, inter alia, by the following:

a. Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

b. In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

c. Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

77. The existence of the above-described unlawful de facto policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the CITY, including, without limitation, Commissioner Kelly.

---

[28]     Id.

[29]     David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, others say department overlooks corruption*, New York Newsday, November 18, 1991, at 6.

78. The actions of Det. CORDERO and the other officers involved in Mr. REYES' arrest and prosecution resulted from and were taken pursuant to the above-mentioned de facto policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves of their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors, commanders and Commissioner Kelly who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

79. All of the foregoing acts by defendants deprived Mr. REYES of his federally protected rights, including, but limited to, the constitutional rights enumerated in paragraphs "52" through "58" above.

80. Defendant CITY knew or should have known that the acts alleged herein would deprive Mr. REYES of his rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

81. Defendant CITY is directly liable and responsible for the acts of Dets. CORDERO, TALAVERA and DOE 1 through 3 because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

82. Despite knowledge of such unlawful <u>de facto</u> policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including Commissioner Kelly, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

83. The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, Dets. CORDERO, TALAVERA and DOE 1 through 3 felt empowered to arrest Mr. REYES without probable cause and then fabricate and swear to a false story to cover up their blatant violations of Mr. REYES' constitutional rights. Pursuant to the aforementioned CITY policies, practices and/or customs, other officers failed to intervene in or report Det. CORDERO's ongoing violations of Mr. REYES' rights.

84. Mr. REYES' injuries were a direct and proximate result of the defendant CITY and the NYPD's wrongful de facto policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

### FOURTH CLAIM
### MALICIOUS PROSECUTION
### UNDER THE LAWS OF THE STATE OF NEW YORK

85. Mr. REYES incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

86. By the actions described above, by making false allegations and forward them to a narcotics prosecutor, and by the the false allegations against Mr. REYES in the accusatory instrument, to the grand jury, and at the Mapp/Dunaway hearing, and at other points throughout the prosecution, Det. CORDERO caused a criminal proceeding to be initiated against Mr. REYES, even though there was no probable cause for an arrest or prosecution in this matter. Det. CORDERO maliciously caused this prosecution to be initiated in that he knew there was no probable cause for such prosecution. The criminal case against Mr. REYES was terminated in his favor in that all charges were dismissed in their entirety after the criminal court ruled that his arrest was made without probable cause.

87. The conduct of Det. CORDERO alleged herein, occurred while he was on duty and in uniform, and/or in and during the course and scope of his duties and functions as NYPD officer, and/or while he was acting as an agent and employee of defendant CITY, clothed with and/or invoking state power and/or authority, and, as a result, defendant CITY is liable to Mr. REYES pursuant to the state common law doctrine of respondeat superior.

88. As a result of the foregoing, Mr. REYES was deprived of his liberty, endured psychological and emotional injury, humiliation, costs and expenses, and was otherwise damaged and injured.

## JURY DEMAND

89. Mr. REYES demands a trial by jury in this action on each and every one of his damage claims.

   **WHEREFORE** Mr. REYES demands judgment against the defendants individually and jointly and prays for relief as follows:

   a.   That he be compensated for violation of his constitutional rights, pain, suffering, mental anguish, and humiliation; and

   b.   That he be awarded punitive damages against the individual defendants; and

   c.   That he be compensated for attorneys' fees and the costs and disbursements of this action; and

   d.   For such other further and different relief as to the Court may seem just and proper.

Dated:   New York, New York
         November 16, 2012

                                             Respectfully submitted,

                                             /s/
                                   By:    _____
                                             David B. Rankin
                                             Rankin & Taylor, PLLC
                                             *Attorneys for the Plaintiff*
                                             350 Broadway, Suite 701
                                             New York, New York 10013
                                             t: 212-226-4507